SLIP OP. 09-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

GPX INTERNATIONAL TIRE
CORPORATION and HEBEI
STARBRIGHT TIRE CO., LTD.,

           Plaintiffs,

         v.

UNITED STATES,

           Defendant,

           and

BRIDGESTONE AMERICAS, INC.,
BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC, TITAN TIRE
CORPORATION, and UNITED STEEL,
PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO-CLC,

           Defendant-Intervenors.
_____

Before: Jane A. Restani, Chief Judge

Consol. Court No. 08-00285

## OPINION

[Plaintiffs' motions for judgment on the agency record granted in part. Defendant-Intervenors' motions for judgment on the agency record granted in part. Remand to Department of Commerce for changes to its nonmarket economy antidumping duty and countervailing duty methodologies to account for or forego the imposition of the countervailing duty law on NME products.]

Dated: September 18, 2009

Winston & Strawn LLP (Daniel L. Porter and James P. Durling); Hinckley, Allen & Snyder LLP (Eric F. Eisenberg); Orrick, Herrington & Sutcliffe LLP (John A. Jurata, Jr.) for the plaintiffs.

Greenberg Traurig, LLP (Philippe M. Bruno and Rosa S. Jeong) for the

consolidated plaintiff.

       Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (John J. Todor and Loren M. Preheim); John D. McInerney, Chief Counsel for Import Administration, Irene H. Chen, Carrie L. Owens, Matthew D. Walden, David Richardson, and Ahran Kang McCloskey, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant. -

       King & Spalding, LLP (Joseph W. Dorn, Christopher T. Cloutier, Daniel L. Schneiderman, J. Michael Taylor, Jeffrey M. Telep, Kevin M. Dinan, and Prentiss L. Smith); Stewart and Stewart (Geert M. De Prest, Elizabeth A. Argenti, Elizabeth J. Drake, Eric P. Salonen, Terence P. Stewart, Wesley K. Caine, and William A. Fennell) for the defendant-intervenors.

       Restani, Chief Judge: These consolidated court actions challenge the Department of Commerce's ("Commerce") final determinations rendered in concurrent antidumping duty ("AD") and countervailing duty ("CVD") investigations of certain pneumatic off-the-road ("OTR") tires from the People's Republic of China ("PRC" or "China"). Motions for judgment on the agency record were filed by GPX International Tire Corporation ("GPX") and Hebei Starbright Tire Co., Ltd. ("Starbright"), Titan Tire Corporation and the United Steel, Paper and Forestry, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (collectively, "Titan"), Bridgestone Americas, Inc. and Bridgestone America Tire Operations, LLC (collectively, "Bridgestone"), and Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC"). Pursuant to court order, motions for judgment on the agency record were divided into three key issues: (1) CVD applicability and nonmarket economy ("NME") AD coordination issues; (2) all other AD issues; and (3) all other CVD issues.

       For the reasons stated below, the court finds that Commerce is not barred by

statutory language from applying the CVD law to imports from the PRC, but that Commerce's current interpretation of the NME AD statute in relation to the CVD statute here was unreasonable. If Commerce is to apply CVD remedies where it also utilizes NME AD methodology, Commerce must adopt additional policies and procedures for its NME AD and CVD methodologies to account for the imposition of the CVD law to products from an NME country and avoid to the extent possible double counting of duties. In the absence of designation as a market economy ("ME"), to identify and measure subsidies in the PRC, Commerce must also determine the type of subsidy and whether the subsidy is measurable at a particular time in the PRC, rather than imposing a bright-line cut-off date.

Accordingly, GPX and Starbright's motion for summary judgment on the CVD and NME AD coordination issues is granted in part and denied in part, and GPX and Starbright's motions for summary judgment on all other AD and CVD issues are granted in part and denied in part. Titan and Bridgestone's motions for judgment on the agency record on all other AD and CVD issues are granted in part and denied in part.[1]

## BACKGROUND

On June 18, 2007, Titan filed petitions seeking imposition of ADs and CVDs for certain pneumatic OTR tires from the PRC. (See App. to Brs. Filed by Titan ("Titan App.") Tab CVD PR Doc. 1.) Commerce initiated AD and CVD investigations for the subject merchandise

---

[1] The court does not rule on the merits of the AD and CVD issues raised in the parties' briefs to the extent that they do not relate to the above issues, and thus, the court does not resolve most separate AD calculations. Nor does the court resolve TUTRIC's motion for judgment on the agency record on separate CVD issues. The court does find, however, that Titan failed to exhaust its administrative remedies with respect to the managed exchange rate subsidy. Any party which contends that its original action can and should be decided independently of the remand ordered here may file a motion for severance.

for the period of October 1, 2006 through March 31, 2007.  See Certain New Pneumatic

Off-the-Road Tires From the People's Republic of China: Initiation of Countervailing Duty

Investigation, 72 Fed. Reg. 44,122 (Dep't Commerce Aug. 7, 2007) ("CVD Notice"); Initiation

of Antidumping Duty Investigation: Certain New Pneumatic Off-the-Road Tires From the

People's Republic of China, 72 Fed. Reg. 43,591 (Dep't Commerce Aug. 6, 2007).  Commerce

selected three Chinese producers/exporters of pneumatic OTR tires as mandatory respondents for

both the AD and CVD investigations: Starbright, TUTRIC, and Guizhou Tyre Co., Ltd.

("Guizhou").[2]  See Final AD Determination, 73 Fed. Reg. at 51,625; Certain New Pneumatic

Off-the-Road Tires From the People's Republic of China: Final Affirmative Countervailing Duty

Determination and Final Negative Determination of Critical Circumstances, 73 Fed. Reg.

40,480, 40,483 (Dep't Commerce July 15, 2008) ("Final CVD Determination").  GPX is a

domestic importer of OTR tires and wholly owns Chinese producer Starbright.  See Verification

of the Factors Response of Starbright in the Antidumping Duty Investigation of Certain New

Pneumatic Off-The-Road Tires from the People's Republic of China, A-570-912, at 3–4 (May 5,

2008) ("AD Verification Report"), available at Pls.' App. Tab 11.  Titan and Bridgestone are

manufacturers of OTR tires in the United States.  See Final AD Determination, 73 Fed. Reg. at

51,625; (Br. of Titan in Opp'n to GPX & Starbright's Mot. for J. Upon the Agency R. as to

---

[2] Xuzhou Xugong Tyres Co., Ltd. ("Xugong") was also selected as a mandatory respondent in the AD investigation and received a zero percent dumping margin.  See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 73 Fed. Reg. 51,624, 51,625 (Dep't Commerce Sept. 4, 2008) ("Final AD Determination"). Titan and Bridgestone's motions for judgment on the agency record with respect to Xugong were addressed in a separate action before this court.  See Bridgestone Americas, Inc. v. United States, Slip Op. 09-79, 2009 WL 2390221 (CIT Aug. 4, 2009).

AD/CVD "Coordination" Issue 2).

Using NME methodologies, Commerce calculated an AD margin of 29.93% for Starbright, 8.44% for TUTRIC, and 5.25% for Guizhou. See Final AD Determination, 73 Fed. Reg. at 51,625. Commerce also calculated a CVD margin of 14% for Starbright, 6.85% for TUTRIC, and 2.45% for Guizhou. See Final CVD Determination, 73 Fed. Reg. at 40,483. The International Trade Commission ("ITC") published its affirmative injury determination on September 5, 2008. See Certain Off-the-Road Tires From China; Determination, 73 Fed. Reg. 51,842 (ITC Sept. 5, 2008).

On September 9, 2008, GPX filed three complaints with the court, contesting the CVD determination, the AD determination, and the ITC's injury determination.[3] On November 12, 2008, the court denied GPX's motion for a temporary restraining order and a preliminary injunction to prevent the imposition of the approximate 44% cash deposit requirement while the merits of the underlying actions were decided. GPX Int'l Tire Corp. v. United States, 587 F. Supp. 2d 1278, 1291–92 (CIT 2008), reh'g denied, 593 F. Supp. 2d 1389 (CIT 2008). On February 12, 2009, the court also denied the Ministry of Commerce, People's Republic of China's motion to intervene, as good cause was not established for the untimely motion. GPX Int'l Tire Corp. v. United States, Slip Op. 09-11, 2009 WL 362136 (CIT Feb. 12, 2009). On January 20, 2009, the court consolidated herewith all actions challenging the final AD and CVD

---

[3] Titan and Bridgestone filed complaints contesting both the AD and CVD determinations on October 31, 2008. TUTRIC filed a complaint contesting the CVD determination on November 5, 2008.

determinations, except for the matter involving Xugong.  Order (Jan. 20, 2009).[4]

## STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold Commerce's final determinations in AD and CVD investigations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

I.      CVD Applicability and NME AD Coordination

A.      **The unfair trade statutes are ambiguous regarding the application of CVD remedies to products from the PRC.**

Prior to 2007, Commerce did not apply CVD law to any type of NME country, finding that the centrally controlled economies in NME countries made it difficult to "disaggregate government actions in such a way as to identify the exceptional action that is a subsidy."  Carbon Steel Wire Rod from Czechoslovakia: Final Negative Countervailing Duty Determination, 49 Fed. Reg. 19,370, 19372 (Dep't Commerce May 7, 1984) ("CSW from Czechoslovakia"); see also Countervailing Duties, 63 Fed. Reg. 65,348, 65,360 (Dep't Commerce Nov. 25, 1998) (Where [Commerce] determines that a change in status from non-market to market is warranted, subsidies bestowed by that country after the change in status would become subject to the CVD law.").  Commerce effected a sea change in 2007, however, when it determined that although the PRC remained designated as an NME country, Commerce could apply the CVD law to products from the PRC.  See Coated Free Sheet Paper From the

---

[4] On March 25, 2009, GPX's action challenging the ITC's injury determination was voluntarily dismissed pursuant to USCIT Rule 41(a)(1)(B).

People's Republic of China: Amended Preliminary Affirmative Countervailing Duty

Determination, 72 Fed. Reg. 17,484 (Dep't Commerce Apr. 9, 2007) ("CFS Paper Preliminary

Determination"); Coated Free Sheet Paper from the People's Republic of China: Final

Affirmative Countervailing Duty Determination, 72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25,

2007); Issues and Decision Memorandum for the Final Determination in the Countervailing Duty

Investigation of Coated Free Sheet from the People's Republic of China, C-570-907, at 19–23

(Oct. 17, 2007), available at http://ia.ita.doc.gov/frn/summary/PRC/E7-21046-1.pdf.  Commerce

reasoned that the PRC had enacted significant and sustained economic reforms, which allowed

the PRC's economy to sufficiently advance beyond the Soviet-style command economy so that

Commerce could now determine the transfer of a specific financial contribution and benefit from

the government to a producer in China.  See Countervailing Duty Investigation of Coated Free

Sheet Paper from the People's Republic of China - Whether the Analytical Elements of the

Georgetown Steel Opinion are Applicable to China's Present-Day Economy, C-570-907, at 10

(Mar. 29, 2007) ("Georgetown Steel Memorandum"), available at

http://ia.ita.doc.gov/download/nme-sep-rates/prc-cfsp/china-cfs-georgetown-applicability.pdf.

Specifically, Commerce determined that wages between employers and employees largely

appeared to be renegotiated; foreign investment, though directed, was largely permitted; many

state-owned enterprises had been privatized; and China's command economy had receded and

the majority of prices liberalized.  Id. at 3, 5–10.  Commerce noted that the PRC's present-day

economy "features both a certain degree of private initiative as well as significant government

intervention, combining market processes with continued state guidance."  Id. at 7.  Despite

these findings, Commerce continues to treat the PRC as an NME country due to remaining

government constraints, such as the slow process of liberalizing the renminbi to allow

development of a normal foreign exchange market, the continuing restrictions on foreign

investment, the slow pace of reforms in the banking sector, and the limitations on private

ownership.  Antidumping Duty Investigation of Certain Lined Paper Products from the People's

Republic of China - China's Status as a non-market economy, A-570-901, at 2–3, 5 (Aug. 30,

2006) ("Lined Paper Memorandum"), available at Pls.' App. Tab 5.

    The court previously noted that the leading case upholding Commerce's decision

not to apply CVD remedies to imports from an NME country, Georgetown Steel Corp. v. United

States, 801 F.2d 1308 (Fed. Cir. 1986), is ambiguous.  As the court stated, it is "not clear

whether the Court of Appeals in interpreting the trade laws at issue in Georgetown Steel was

deferring to a determination of Commerce based on ambiguity in the statute or whether the Court

held that there was only one legally valid interpretation of the statute."  GPX Int'l Tire, 587 F.

Supp. 2d at 1289–90 (citing Georgetown Steel, 801 F.2d at 1314–18).  Despite this lack of

clarity, we do know that, at a minimum, the Court of Appeals affirmed Commerce's

determination that the CVD law did not apply to NME countries under the facts extant at the

time, reasoning that "[e]ven if one were to label these incentives as a 'subsidy,' in the loosest

sense of the term, the governments of those [NMEs] would in effect be subsidizing themselves."

Georgetown Steel, 801 F.2d at 1316.  The Court of Appeals also reasoned that Congress had

addressed "the problem of exports by [NMEs] through other statutory provisions" so that "any

selling by [NME countries] at unreasonably low prices should be dealt with under the antidumping law."[5] Id.

It is unnecessary, however, to resolve the ambiguity as to the holding of Georgetown Steel, as National Cable & Telecommunications Ass'n v. Brand X Internet Services, 545 U.S. 967 (2005), instructs the court that "[b]efore a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction." Brand X, 545 U.S. at 985. Because Georgetown Steel did not hold unambiguously that the CVD law may not be applied to the imports from an NME, the court must now decide whether the relevant provisions of the CVD law itself, 19 U.S.C. §§ 1671 and 1677(5), are ambiguous. If the statutes are ambiguous, it does not matter whether Commerce's new interpretation of the statutes conflicts with its old interpretation, because the court is now looking at Commerce's new interpretation and will give that interpretation deference if it is reasonable. See United States v. Eurodif S.A., 129 S. Ct. 878, 886 (2009) ("[A] court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a different reasonable interpretation.").

Under § 1671, Commerce determines whether "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind

---

[5] An AD is imposed when Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," and the ITC determines that a domestic industry is "materially injured." 19 U.S.C. § 1673(1)–(2). Determining less than fair value requires a comparison of a normal value, usually the price for the product in the country of manufacture, with the price of merchandise to be sold in the United States. See id. § 1673. Under NME AD procedures, normal value is usually calculated using costs in surrogate ME countries. See id. § 1677b(c).

of merchandise imported . . . into the United States." 19 U.S.C. § 1671(a)(1). The term

"country" is defined broadly and applies to foreign countries, among other entities. See id.

§ 1677(3). Neither of these provisions limits the type of country to which Commerce is

permitted to apply the CVD law, nor does either provision specifically reference NME countries.

Similarly, while the NME AD statute specifically discusses NME countries, it makes no

reference to the imposition of CVDs on the goods of an NME country. See id. § 1677b.

A review of the legislative history since Georgetown Steel indicates that the AD

and CVD statutes do not account for Commerce's new hybrid treatment. The 1988 Omnibus

Trade and Competitiveness Act changed the NME AD law, but the CVD statute was left

relatively unchanged. See Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-

418, 102 Stat. 1107. While language was proposed that would have granted Commerce the

authority to apply CVD law to NME countries on a case-by-case basis, ultimately such language

was not adopted. See H.R. Rep. No. 100-576, at 628 (1988) (Conf. Rep.). Additionally, in

1994, the Uruguay Round Agreements Act changed both the AD and CVD laws, but did not add

a reference to NME countries to the CVD law. Uruguay Round Agreements Act, Pub. L. No.

103-465, 108 Stat. 4809 (1994).

GPX argues that this legislative history indicates that "Congress has reaffirmed a

statutory scheme that unambiguously does not allow application of the CVD law to NMEs," by

continuously leaving the CVD statute intact while actively amending the AD law as it applied to

NME countries. (Pls.' Mem. of P. & A. in Supp. of Mot. for J. on the Agency Rs. Vol. 1:

CVD/NME AD Coordination Issue ("Pls.' Coordination Br.") 11, 12–20.) The Government, by

contrast, maintains that the CVD law gives Commerce the authority to apply the CVD law to any

type of country.  (Def.'s Mem. in Opp'n to Pls.' Mem. Regarding CVD/NME Coordination Issue

in Supp. of Mot. for J. Upon the Agency Rs. ("Gov't Coordination Br.") 18.)  The Government

explains that "[b]ecause Commerce was not considering applying the CVD law to any NMEs at

the time, the fact that Congress did not then revise the statute is not significant.  There was no

need for any revision."  (Id. at 13.)  Further, the Government highlights Congress' authorization

of appropriations to Commerce for "defending United States [AD] and [CVD] measures with

respect to products of the [PRC]," which the Government argues demonstrates Congress'

understanding that Commerce possessed legal authority to apply CVD law to NME countries.

(Id. at 16–18 (quoting 22 U.S.C. § 6943(a)(1)).)[6]

          Congressional silence regarding the application of the CVD law to NME

countries may indicate that Congress never anticipated that the CVD law would be applied while

a country remained designated as an NME country.  See, e.g., Groff v. United States, 493 F.3d

1343, 1354 (Fed. Cir. 2007) ("Absent some indication otherwise, Congress' silence is just

that—silence." (internal quotation marks and citation omitted)).  Commerce's past interpretation

of the statutes had only been along clear lines—either a country was an NME country and CVDs

were not imposed, or it was an ME country and CVDs could be imposed.  Thus, there was no

reason for Congress also to amend the CVD law to address concerns unique to NMEs when it

amended the AD law.  The CVD law was not being applied to NME countries then.  Commerce,

however, has been granted broad discretion in determining the existence of a subsidy under the

CVD law.  See Magnola Metallurgy, Inc. v. United States, 508 F.3d 1349, 1355 (Fed. Cir. 2007);

---

[6] Of course, this statement does not address under what conditions or how AD and CVD measures may be applied to the same goods from the PRC.

Georgetown Steel, 801 F.2d at 1318. The court, therefore, cannot say from the statutory

language alone that Commerce does not have the authority to impose CVDs on products from an

NME-designated country.

It is not clear, however, how the CVD and AD law may work together in the

NME context, if at all, and Georgetown Steel explains that at least with respect to the old-style

NME countries, the AD statute was intended to cover the ground. See 801 F.2d at 1316. Thus,

no coordination was necessary. Unlike the ME context where private decision-making is

expected to control the setting of prices, the NME AD statute was designed to account for

government intervention in an NME country's economy, including resulting price distortion.

See Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) ("The antidumping

statute recognizes a close correlation between [an NME] and government control of prices,

output decisions, and the allocation of resources."); see also Magnesium Corp. of Am. v. United

States, 166 F.3d 1364, 1368 (Fed. Cir. 1999) ("[T]he prices of the goods produced in an NME

are subject to discrepancies which distort their value. . . . In such a situation, Commerce

calculates the [fair market value] according to 19 U.S.C. § 1677b(c) [by using a surrogate

methodology]." (internal quotation marks and citation omitted)). The NME AD statute overlaps

with the functioning of the CVD statute, which is "to counteract any unfair advantage gained by

government intervention," Royal Thai Government v. United States, 441 F. Supp. 2d 1350, 1365

(CIT 2006), over "the manufacture, production, or export of . . . merchandise imported . . . into

the United States," 19 U.S.C. § 1671(a)(1); see also Wolff Shoe Co. v. United States, 141 F.3d

1116, 1117 (Fed. Cir. 1998) ("The [CVD] laws impose additional duties on imported products

which are subsidized by the country of export or manufacture. . . . to offset the unfair

competitive advantages created by foreign subsidies."). Thus, the AD and CVD law when applied to NME countries both work to correct government distortion of market prices.

Accordingly, the court finds that while Commerce may have the authority to apply the CVD law to products of an NME-designated country, the CVD and NME AD statutes are unclear as to how Commerce is to account for the overlap between the statutes when imposing both CVD and AD duties on goods from an NME country.

**B.      Commerce's statutory interpretation and resulting methodologies are unreasonable.**

Georgetown Steel makes clear that Commerce need not apply CVD law to the same goods that are subject to NME AD calculations. Nonetheless, here Commerce has attempted to do both. Due to the ambiguity in the AD and CVD statutes, the court must determine whether Commerce's interpretation as to how to apply the AD and CVD law jointly to goods from the PRC is reasonable. See Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir. 1994) ("Chevron requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable."). For the reasons discussed below, the court finds that Commerce's interpretation of the NME AD statute in relation to the CVD statute here and the resulting methodologies are unreasonable.

*1.      Dual imposition of ADs and CVDs in NME countries has a high potential for double remedies.*

GPX alleges that the application of both the CVD and AD law using the NME methodology results in a double counting of duties, as it "punishes Chinese companies twice for the same allegedly 'unfair' trading practice." (See Pls.' Mem. of P. & A. in Supp. of Mot. for J. on the Agency Rs. Vol. 2: All Other AD Issues ("Pls.' AD Br.") 25.) The Government, on the

other hand, maintains that "[t]he AD and CVD laws provide separate remedies for separate unfair trade practices" and that "the classification of China as an NME under the AD law does not have any necessary consequence under the CVD law." (Gov't Coordination Br. 12–13.) The court disagrees with the Government's position.

Commerce concluded that "absent a statutory directive for an adjustment and underlying assumption similar to that regarding CVDs imposed to offset export subsidies,[7] or evidence that domestic subsidies[8] have lowered U.S. prices in a given case, any adjustment for an assumed or undetermined effect would be inappropriate." Issues and Decision Memorandum for the Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, A-570-912, POR 10/1/06-3/31/07, at 15–16 (July 7, 2008) ("AD Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16156-1.pdf (internal quotation marks and citation omitted). Commerce is referring to the requirement under 19 U.S.C. § 1677a, to make an adjustment to export price in its AD margin calculations for export subsidies in an ME country by the amount of any CVD imposed. See 19 U.S.C. § 1677a(c)(1)(C). Here, Commerce found that the silence in § 1677a "about the plainly related issue of CVDs to offset domestic subsidies, is not complete silence—it implies that no adjustment is appropriate." AD Issues and Decision Memorandum at 14. That is, Commerce could see "no reason why Congress would have

---

[7] An export subsidy "is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions." 19 U.S.C. § 1677(5A)(B).

[8] A domestic subsidy is "a specific subsidy [other than an export subsidy or import substitution subsidy], in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy." 19 U.S.C. § 1677(5A)(D).

provided for the addition of export subsidy CVDs, but not considered the plainly related issue of

domestic subsidy CVDs." Id. Further, Commerce determined that it would be speculative to

presume that domestic subsidies automatically lower export prices, and that the respondents had

not provided evidence that "the benefits received from any domestic subsidy lowers U.S. prices,

pro rata." Id. at 13–14; see also Certain New Pneumatic Off-The-Road Tires From the People's

Republic of China; Preliminary Determination of Sales at Less Than Fair Value and

Postponement of Final Determination, 73 Fed. Reg. 9278, 9287 (Dep't Commerce Feb. 20,

2008) ("Preliminary AD Determination") ("Whereas the connection between export subsidies

and export prices is direct, the connection between domestic subsidies and export price is

indirect and subject to a number of variables.").

GPX argues that double counting occurs when Commerce imposes a CVD

remedy to offset an alleged government subsidy, but then compares a subsidy-free constructed

normal value (essentially using information from surrogate countries) with the original

subsidized export price to calculate the AD margin. (Id.) GPX maintains that just as Commerce

must make adjustments to avoid double counting to its AD margin calculations for export

subsidies, Commerce must also adjust its methodology to account for domestic subsidies that

have been remedied under the CVD law whenever an AD margin is being calculated based upon

NME AD methodology.[9] (Pls.' Coordination Br. 29–32.) GPX argues that it "makes no

_____

[9] In ME countries, an export subsidy is assumed to result in a lower export price, because it creates an incentive for export sales over domestic sales. A CVD in the amount of the export subsidy fully corrects for this subsidy, and thus when an AD is also imposed to correct for sales at less than fair value, this results in double remedies and an adjustment is made. See 19 U.S.C. § 1677a(c)(1)(C). As GPX explains, there is no double remedy problem for domestic subsidies in ME AD cases, because the foreign producer's or exporter's own prices, however they may be

(continued...)

economic sense" to assume that a foreign producer will always keep for corporate purposes all of the benefit received from a domestic subsidy by not lowering its price, but give up all such benefit by lowering its prices when it receives an export subsidy. (Pls.' AD Br. 27.) While GPX concedes that the effect of domestic subsidies on export prices depends on the economic circumstances, it contends that when Commerce has already imposed a CVD based on the full value of the subsidy, Commerce must then "take that action into account when making decisions in the parallel AD case." (Id. at 30.)

GPX further argues that by finding no double remedy problem absent affirmative evidence from a respondent, Commerce created a rebuttable presumption that domestic subsidies do not lower export prices without providing a rational basis for doing so or giving advance notice to the parties. (Id. at 32.) GPX maintains that in requiring respondents to submit evidence that domestic subsidies actually lowered export prices, Commerce has imposed an impractical and onerous burden that is not required of respondents under the export subsidy adjustment. (Id. at 34–35.)

As previously discussed, the NME AD statute was designed to remedy the inability to apply the CVD law to NME countries, so that subsidization of a foreign producer or exporter in an NME country was addressed through the NME AD methodology. See Georgetown Steel, 801 F.2d at 1316. Commerce's dual imposition of CVD and AD law on products of NME countries creates issues which do not present themselves when AD margins for ME countries are calculated. Congress' silence with respect to domestic subsidies under

---

[9](...continued)
affected by such subsidies, are used to calculate the AD margins. (Pls.' Coordination Br. 30–31.)

§ 1677a, as with its silence in other areas of the AD and CVD law, may well indicate that Congress did not consider this new hybrid when it enacted the export subsidy adjustment, and not, as Commerce argues, that Congress intended to prohibit adjustments to the NME AD methodology because of domestic subsidies.

Commerce has previously noted in an investigation involving an ME country that "[d]omestic subsidies presumably lower the price of the subject merchandise both in the home and the U.S. markets, and therefore have no effect on the measurement of any dumping that might also occur." Notice of Final Results of Antidumping Duty Administrative Review: Low Enriched Uranium From France, 69 Fed. Reg. 46,501, 46,506 (Dep't Commerce Aug. 3, 2004). Here, the export price is not being compared with the price of the good in the PRC in which case both sides of the comparison would be equally affected, but rather, export price, however it is affected by the subsidy, is compared with the presumptively subsidy-free constructed normal value. Without some type of adjustment for this, the imposition of AD duties could very well result in a double remedy. See, e.g., U.S.-China Trade: Commerce Faces Practical and Legal Challenges in Applying Countervailing Duties, GAO-05-474, at 28 (June 2005) ("GAO Report"), available at http://www.gao.gov/new.items/d05474.pdf ("[W]hen the [constructed] normal value is compared with the export price, the difference will, at least in theory, reflect the price advantages that the exporting company has obtained from both export and domestic subsidies."). The Government acknowledges that "domestic subsidies may have some effect upon export prices," but contends that this "effect is so uncertain that it would not have been a sound basis for any formal determination." (Def.'s Mem. in Opp'n to Pls.' & Def.-Intervenors' Memoranda Regarding AD Issues in Supp. of Mot. for J. Upon the Agency Rs. 31.)

Commerce cannot avoid addressing an important aspect of the problem caused by applying CVD and AD methodologies to goods from NME countries by placing the burden to demonstrate double counting on GPX, because there is likely no way for any respondent to accurately prove what may very well be occurring. As the CVD law recognizes, the exact effect of subsidies on price is difficult to measure. Thus, the price effect is not measured in the calculations of CVDs. See 19 U.S.C. § 1677(5)(C). The court does not expect parties to prove in an individual NME case confirmable double counting just for the purpose of getting Commerce to address the problem of the greater potential for double counting in NME cases than exists with ME calculations.[10] There is an assumption that CVD remedies equalize the competitive playing field, by raising the price of the good when it is exported into this country. See, e.g., GAO Report at 33 ("[T]here is substantial potential for double counting of domestic subsidies if Commerce applies CVDs to China while continuing to use its current NME methodology to determine [ADs].").[11] If there is a substantial potential for double counting, and it is too difficult for Commerce to determine whether, and to what degree double counting is occurring, Commerce should refrain from imposing CVDs on NME goods until it is prepared to address this problem through improved methodologies or new statutory tools.

Commerce has a choice. The unfair trade statutes, as Georgetown Steel recognized, give Commerce the discretion not to impose CVDs as long as it is using the NME

---

[10] While subsidies may affect allocation of resources in some instances, there is no reason to presume that price effects are therefore unlikely in most cases.

[11] The Government Accountability Office opined that "in such a situation, Commerce should be provided authority to proactively address potential double counting, rather than waiting for it to occur and create methodological and legal problems." Id.

AD methodology. Thus, Commerce reasonably can do all of its remedying though the NME AD statute, as it likely accounts for any competitive advantages the exporter received that are measurable. If Commerce now seeks to impose CVD remedies on the products of NME countries as well, Commerce must apply methodologies that make such parallel remedies reasonable, including methodologies that will make it unlikely that double counting will occur. The court finds that it was unreasonable for Commerce to require GPX to submit specific evidence that a double remedy of a particular amount actually was imposed on its products when parallel NME AD and CVD procedures were utilized. Sufficient error has been demonstrated to require remand.

> 2.    *Commerce's failure to address GPX's request for market oriented enterprise treatment because it had no policies, procedures, or standards for evaluating market oriented enterprise status was arbitrary and capricious and not supported by substantial evidence*

Commerce declined to address GPX's request for individual market oriented enterprise ("MOE") treatment in order for Starbright's AD margin to be calculated according to ME calculation rules, stating that it has "no policies, procedures or standards for evaluating the MOE status of a company at this time." Starbright – Request for Market-Oriented Entity Status and Market-Economy Section B Response, A-570-912, POR 10/01/06-3/31/07, at 2 (May 8, 2008) ("MOE Memorandum"), available at Pls.' App. Tab 10. Commerce found that under its current practice, "there is no category of NME companies defined as MOEs and there are no criteria that qualify a company as an MOE such that we would use the ME methodology for a NME company."[12] AD Issues and Decision Memorandum at 184 (internal quotation marks and

---

[12] China's World Trade Organization ("WTO") Accession Protocol allows for some

citation omitted).  The court finds that Commerce's decision here was arbitrary and capricious and unsupported by substantial evidence.

GPX alleges that even if Commerce has the authority to impose CVDs on NME countries, fundamental fairness compels Commerce to amend its NME methodology to allow for some type of application of its ME AD methodology.  (Pls.' Coordination Br. 33.)  In particular, GPX maintains that it was legal error for Commerce to refuse to consider Starbright's request to be considered an MOE, as the record demonstrated that Starbright was "a U.S. owned and managed company for which normal value would be based on third country export sales, and for which Commerce has complete and verified market economy data."  (Pls.' AD Br. 14–15; see also Pls.' App. Tab 9.)

As a preliminary matter, Commerce did not dismiss GPX's request for MOE status because it was untimely, but rather, because it did not have the procedures to address it.  MOE Memorandum at 2.  Bridgestone contends that Starbright's untimely submission of its ME normal value information "deprived Petitioners of any opportunity to comment, precluded Commerce from issuing supplemental questionnaires, and prevented Commerce from issuing [an ME] verification outline."  (Bridgestone's Br. in Opp'n to Pls.' Mot. for J. Upon the Agency R. for CVD/NME AD Coordination Issue 39.)  The court disagrees.  On February 20, 2008,

---

[12](...continued)
adjustments to be made on an industry or sector-wide basis.  See World Trade Organization, Protocol on the Accession of the People's Republic of China, pt. I, § 15(d) (Nov. 23, 2001), WT/L/432, available at http://www.wto.org/english/theWTO_e/acc_e/completeacc_e.htm ("[S]hould China establish . . . that market economy conditions prevail in a particular industry or sector, the non-market economy provisions . . . shall no longer apply to that industry or sector.").  GPX did not request such treatment, presumably because it would be difficult to use ME calculations for the entire pneumatic OTR tire industry.

Commerce published its preliminary determination, which calculated a separate rate for

Starbright based on NME methodology.  See Preliminary AD Determination, 73 Fed. Reg. at

9283, 9291.  On March 18, 2008, GPX requested that Commerce grant Starbright an ME AD

margin through MOE treatment, if Commerce refused to collapse Starbright and TUTRIC so as

to be treated as a single entity.  (See Pls.' App. Tab 9, at 2.)  This request was filed a week

before Commerce conducted verification in the AD investigation, see AD Verification Report at

1, and nearly four months before the final determination was published, see Certain New

Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative

Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical

Circumstances, 73 Fed. Reg. 40,485 (July 15, 2008), amended by 73 Fed. Reg. 51,624.  Thus,

Commerce had sufficient time to address GPX's request.  Further, Commerce cannot now rely

on any claim of untimeliness because that was not its avowed reason for the rejection of the

request.

Commerce is required to "establish[] antidumping margins as accurately as

possible."  Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir.

2001).  In order for Commerce to apply the NME AD methodology, Commerce must determine

that "the subject merchandise is exported from [an NME] country," 19 U.S.C. § 1677b(c)(1)(A),

which is defined as "any foreign country that [Commerce] determines does not operate on

market principles of cost or pricing structures, so that sales of merchandise in such country do

not reflect the fair value of the merchandise," id. § 1677(18).  Commerce must also find "that

available information does not permit the normal value of the subject merchandise to be

determined." Id. § 1677b(c)(1)(B).[13]  By refusing even to consider GPX's request for MOE

status, Commerce did not meet this statutory requirement.

The NME AD statute contains blunt procedures, basically the use of factors of

production from surrogate countries, see id. § 1677b(c), and does not provide for fine-tuned

adjustments.  Further, fine-tuning is likely impossible because the surrogate cannot be compelled

to provide detailed data; general public information is used.  Commerce, however, has provided

alternatives to surrogate values when necessary for accuracy.  See Shakeproof, 268 F.3d at 1383

(finding that Commerce was not required to use only surrogate values when the best available

information on what an input would cost in an ME country was the price actually paid by the

Chinese producer for the input from an ME country); see also Lasko Metal Prods., Inc. v. United

States, 43 F.3d 1442, 1446 (Fed. Cir. 1994) ("The Act simply does not say—anywhere—that the

factors of production must be ascertained in a single fashion," but rather, requires the

"determination to be based on the best available information." (internal quotation marks and

citation omitted)).  Commerce was aware that modification of its NME AD methodology might

be necessary when it decided to begin imposing CVD law on the PRC.  See Georgetown Steel

Memorandum at 11 ("The features and characteristics of China's present-day economy also

suggest that modification of some aspects of the Department's current NME antidumping policy

and practice may be warranted, such as the conditions under which the Department might grant

an NME respondent [ME] treatment.").  Indeed, Commerce has even requested comments on this

---

[13] Thus, Commerce must address whether it may use third country sales or some other measure to determine normal value, see id. § 1677b(a)(1)(C), or whether all non-surrogate methods of calculating normal value for Chinese goods are unreliable under 19 U.S.C. § 1677(18).  If GPX's suggested methodology is rejected as a matter of law or otherwise, the coordination issue addressed in part I.A, supra, will remain.

very issue.  See Antidumping Methodologies in Proceedings Involving Certain Non-Market

Economies: Market-Oriented Enterprise; Request for Comment, 72 Fed. Reg. 60,649 (Dep't

Commerce Oct. 25, 2007); Antidumping Methodologies in Proceedings Involving Certain

Non-Market Economies: Market-Oriented Enterprise, 72 Fed. Reg. 29,302 (Dep't Commerce

May 25, 2007).

It is impossible to tell if Commerce was not required to apply MOE status to

Starbright because Commerce simply refused to address the issue.  As stated previously,

however, if the CVD statute is being imposed in an NME country situation, Commerce must

modify its application of the NME AD statute, which it did not do.[14]  Commerce must determine

---

[14] The court does not decide here if any adjustments are permissible under the statute so that CVD remedies could be imposed.  Both sides have suggested potential adjustments to Commerce's AD methodology in the NME context, including GPX's request for a constructed export price offset and Titan and Bridgestone's request for non-production energy to be included in overhead calculations.  (See Pls.' AD Br. 4–14; Mem. of Titan in Supp. of Mot. for J. Upon the Administrative R. (Addressing "All Other" Antidumping Issues) ("Titan AD Br.") 19–24.)  Many of these adjustments, however, seem logically inconsistent.  When Commerce calculates surrogate values, the information used is not gathered in response to questions asked of mandatory respondents, but rather, Commerce relies on broad information from public documents, which is not broken down in a way that Commerce needs in order to make fine-tuned adjustments.

GPX also argues that Commerce should reverse the presumption that all Chinese exporters are controlled by the state because it is at odds with Commerce's factual findings concerning China's present-day economy.  (Pls.' Coordination Br. 34–36.)  Commerce may wish to reevaluate its methodology with respect to the presumption.  Qingdao Taifa Group Co. v. United States, Slip Op. 09-83, 2009 WL 2447502, at *6 n.6 (CIT Aug. 11, 2009).  As the court recently noted, "[p]resumptions cannot become an excuse for inadequate investigation or assessment."  Id.  In any case, the court believes its rulings herein do not require it to address this aspect of GPX's argument further.

Titan and Bridgestone also argue that unrefunded value added tax ("VAT") should have been included in the normal value calculations.  (Titan AD Br. 16–19.)  To the extent that Commerce used surrogate values to determine the costs of inputs, and not actual purchase prices paid by NME producers for inputs obtained from ME suppliers, the court finds that its recent conclusion that "the amount of unrefunded VAT is irrelevant to the normal value calculation"

(continued...)

how best to harmonize these two statutes and account for the fact that the statute provides no direction as to how to calculate both NME ADs and CVDs at the same time. That is, Commerce must meaningfully address this issue, fill in these gaps, and have some procedures for addressing GPX's legitimate concerns as to NME ADs if it chooses to impose CVDs on the products of NME-designated countries, despite how administratively difficult such an endeavor may be. Many adjustments for the sake of accuracy are made in ME cases, and Commerce cannot fail to make any adjustments here because the agency has not yet decided upon a method to use. If Commerce has a way of fine-tuning adjustments so that it is more likely no double counting will occur, this may be acceptable, but Commerce must make such a decision. Commerce chooses to proceed without regulations in many instances. In such situations it must make case-by-case determinations. Here, it promulgated no regulations nor made a decision in the specific case before it. Accordingly, the court finds that Commerce's failure to address GPX's request for MOE status because it had no policies, procedures, or standards for evaluating MOE status was arbitrary and capricious and unsupported by substantial evidence.

The court remands this matter to Commerce to address the administration of the statute. If it decides it will impose CVDs on NME products, Commerce must find a reasonably accurate way of imposing CVDs on the goods of NME-designated countries, while at the same time using the NME AD methodology, that is consistent with the statute.

---

[14](...continued)
resolves this issue. Bridgestone, 2009 WL 2390221, at *7.

## II.    All Other CVD Issue

### A.    Commerce's adoption of a December 11, 2001, cut-off date was arbitrary and unsupported by substantial evidence.

Commerce must impose a countervailing duty "equal to the amount of the net countervailable subsidy," 19 U.S.C. § 1671(a), and determine the "ad valorem subsidy rate by dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period," 19 C.F.R. § 351.525(a).  When allocating the benefit for non-recurring subsidies, Commerce "normally allocate[s] a non-recurring benefit to a firm over the number of years corresponding to the average useful life ("AUL") of renewable physical assets," id. § 351.524(b)(1), which, in this case, Commerce determined to be fourteen years, see Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, C-570-913, at 5 (July 7, 2008) ("CVD Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-16154-1.pdf.  Here, however, Commerce did not allocate benefits over the entire fourteen-year AUL for non-recurring subsidies, and instead, imposed a cut-off date of December 11, 2001, for identifying and measuring subsidies in the PRC.  Id. at 62–64.  Application of this cut-off date was arbitrary and unsupported by substantial evidence.

Where Commerce has previously imposed cut-off dates in CVD investigations in which the CVD law is applied for the first time to a former NME country, Commerce's practice has been to use the date that a NME country "graduated" to ME status as the official cut-off date for identifying and measuring non-recurring subsidies.  See Issues and Decision

Memorandum for the Final Determination in the Countervailing Duty Investigation of Sulfanilic

Acid from Hungary, C-437-805, at 14–15 (Sept. 18, 2002), available at

http://ia.ita.doc.gov/frn/summary/hungary/02-24358-1.pdf ("[T]he concept that the receipt of a

subsidy constitutes a distortion in the normal allocation of resources has no meaning in [an

NME]." (citation omitted)).  Here, because Commerce determined that the PRC has not achieved

ME status, Commerce could not use the country's graduation date as the cut-off date.  Instead,

Commerce concluded that December 11, 2001, the date of the PRC's accession to the WTO,

would serve as the cut-off date for identifying and measuring subsidies in the PRC.  CVD Issues

and Decision Memorandum at 62–64; see also Issues and Decision Memorandum for the Final

Determination in the Countervailing Duty Investigation of Circular Welded Carbon Quality Steel

Pipe from the People's Republic of China, C-570-911, POR 1/1/06-12/31/06, at 41–44 (May 29,

2008) ("CWP from China Issues and Decision Memorandum"), available at

http://ia.ita.doc.gov/frn/summary/PRC/E8-12606-1.pdf (applying the December 11, 2001, cut-off

date for the first time in CVD investigations involving the PRC).  Commerce explained that by

December 11, 2001, significant reforms, including the elimination of price controls on most

products, the development of a private industrial sector, and the abolition of the government's

mandatory credit plan, had been implemented in the Chinese economy to achieve WTO

membership, which allowed Commerce to identify and measure subsidies in the PRC.  See CVD

Issues and Decision Memorandum at 62; CWP from China Issues and Decision Memorandum at

41.

          Commerce reasoned that a uniform cut-off date was necessary because "a

program-by-program, company-by-company approach [was] not administratively feasible."

CVD Issues and Decision Memorandum at 63.  Specifically, Commerce noted that it was

examining more than thirty alleged subsidies in this investigation, administered at varying

government levels, and that many programs were not straightforward and "require[d] analysis of

several levels of government and banks because practices vary from jurisdiction to jurisdiction."

Id.  Commerce explained that it could not complete CVD investigations within the statutorily

mandated deadlines if it was first required to identify and measure subsidies "on a land plot-by-

land plot or loan-by-loan basis" before then investigating the subsidy.  Id.

GPX supports the application of a cut-off date when imposing CVD law on the

PRC, but maintains that Commerce has not provided a proper basis for abandoning its past

finding that CVD law cannot apply prior to Commerce's conclusion that the NME country

became sufficiently market-based as to apply the CVD law.  (See Pls.' Mem. of P. & A. in Supp.

of Mot. for J. on the Agency Rs. Vol. 3: All Other CVD Issues ("Pls.' CVD Br.") 7–14.)  GPX

further argues that the December 11, 2001, cut-off date is fundamentally inconsistent with

Commerce's logic in the Lined Paper Memorandum, which explained that because of the

incomplete changes in the Chinese economy, Commerce would continue to treat the PRC as an

NME.  (See id. at 11–14); see also Lined Paper Memorandum at 2–5.  Thus, GPX contends that

the cut-off date used should be April 9, 2007, the date when Commerce first applied the CVD

law to China, as the date is analogous to an ME graduation date.  (See Pls.' CVD Br. 8); see also

CFS Paper Preliminary Determination, 72 Fed. Reg. at 17,486.[15]

---

[15] While the Georgetown Steel Memorandum first discussed Commerce's decision to
apply the CVD law to the PRC, this memorandum did not become public until the publication of
(continued...)

Titan and Bridgestone, by contrast, argue that the cut-off date is unlawful, as it causes Commerce arbitrarily to ignore subsidies granted before December 11, 2001, contrary to the statutory requirement under 19 U.S.C. § 1671(a) that Commerce impose CVDs equal to the amount of the net countervailable subsidies. (See Titan Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. (CVD) ("Titan CVD Br.") 23–25.) They maintain that no additional administrative burden would be placed on Commerce if the cut-off date is eliminated, as Commerce is already required to determine whether a subsidy can be identified and measured for each alleged subsidy, and "[i]f a subsidy were granted under conditions that prevented [Commerce] from identifying and measuring the subsidy, this fact would emerge in the context of determinations Commerce already makes in its normal practice." (Id. at 26.) In the alternative, if application of a cut-off date is permissible, Titan and Bridgestone maintain that an earlier date should be used, as many of the reforms relied on by Commerce were present at earlier dates. (See id. at 27–29.)

While "agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources," Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995), Commerce's methodology must still be a "reasonable means of effectuating the statutory purpose" and be supported by substantial evidence, Ceramica Regiomontana, S.A. v. United States, 636 F. Supp. 961, 966 (CIT 1986). Commerce's application of the cut-off date could cause it to impose CVDs not equal to the amount of the net countervailable subsidies, as it arbitrarily based decisions on whether the

---

[15](...continued)
the preliminary determination in CFS Paper. See CFS Paper Preliminary Determination, 72 Fed. Reg. at 17,486.

benefit was received after December 11, 2001. See 19 U.S.C. § 1671(a). For example, Commerce found certain loans to TUTRIC to have been forgiven once the repayment date passed, but found that because this debt forgiveness occurred before December 11, 2001, it was not countervailable. See CVD Issues and Decision Memorandum at 15 n.20. Similarly, in the preliminary determination, Commerce found the Chinese government's provision of land-use rights to Guizhou to be countervailable, see Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, 72 Fed. Reg. 71,360, 71,368 (Dep't Commerce Dec. 17, 2007), but because Commerce received supplemental information, which indicated that all of the essential terms and conditions associated with Guizhou's land use were established prior to the cut-off date, Commerce did not evaluate whether these were countervailable in the final determination, see CVD Issues and Decision Memorandum at 26, 173–74.

The application of the uniform cut-off date is also inconsistent with Commerce's reasoning that it was now able to apply the CVD to an NME by "re-examin[ing] the economic and reform situation of the NME on a case-by-case basis to determine whether [Commerce] can identify subsidies in that country." Id. at 64. By not looking at the specific facts for each subsidy, however, Commerce fails to fully reexamine the relevant economic and reform situation in the PRC. Commerce appears more concerned with determining on what side of the cut-off date a subsidy falls, rather than with evaluating the facts of each alleged subsidy to determine if the particular facts for that subsidy allow Commerce now to calculate a subsidy where it was previously unable to do so. For example, Commerce determined that Starbright's predecessor, Hebei Tire, had received alleged debt forgiveness for guarantees of loans made by state-owned

commercial banks to various entities.  Id. at 148.  Commerce found that Hebei Tire was not a

purely private entity due to some government ownership through a local village committee and

other government interest-based motivations with respect to its employees.  See id. at 126–128.

While the court need not address here the merits of these findings, the court does observe that

such an alleged subsidy—that is, alleged debt forgiveness given from one government arm to

another—appears to be exactly the type of subsidy that Commerce previously said it could not

properly calculate and countervail in NME countries.  See CSW from Czechoslovakia, 49 Fed.

Reg. at 19,371–72 (finding that "in an NME system the government does not interfere in the

market process, but supplants it" and that therefore Commerce "could not disaggregate

government actions in such a way as to identify the exceptional action that is a subsidy"); see

also Georgetown Steel Memorandum at 10 ("[G]iven the pervasive role of NME governments in

the economy in general, . . . an alleged subsidy essentially involved one arm of the government

giving money to another arm.").  In such a situation, it is too facile to say that the subsidy is the

debt forgiveness when it is not clear there was any debt to begin with, because of the level of

government intervention.[16]

        As China's economy is in a continuing state of transition and reform, for

Commerce to identify and measure subsidies in the PRC, Commerce must determine what kind

of subsidy exists and whether the subsidy is measurable at a particular time in the PRC, rather

than through imposition of a bright-line rule.  Commerce itself has recognized that "economic

---

[16] While it would be premature for the court to address whether the change-in-ownership methodology Commerce used to address GPX's alleged loan guarantee subsidy was accurate (see GPX CVD Br. 15–31), the court does note that village ownership does not always equal government ownership for purposes of the unfair trade laws, see Qingdao Taifa, 2009 WL 2447502, at *7–9.

reform is a process that occurs over time" and is uneven, as "reforms may take hold in some sectors of the economy or areas of the country before others." CVD Issues and Decision Memorandum at 63. Indeed, Commerce conceded that "there was not a single moment or single reform law that suddenly permitted us to find subsidies in the PRC," and that "[m]any reforms were put in place before the PRC acceded to the WTO, but [Commerce] has identified other areas where the PRC economy continues to exhibit nonmarket characteristics." Id. While the approach of making specific findings for specific programs may be difficult for Commerce to administer, the AD and CVD laws as enacted by Congress function best by distinguishing between NME and ME countries. If Commerce chooses to recognize a gray area, it must adjust its methodology accordingly.

Commerce's use of a cut-off date was unsupported by substantial evidence, and the court remands to Commerce to determine the existence of countervailable subsidies based on the specific facts for each subsidy, rather than by examining those subsidies found after an arbitrary cut-off date. The court cannot determine whether the applicable dates at which these subsidies are found are earlier or later than December 11, 2001, based on the record evidence, but Commerce must engage in this case-by-case analysis if it chooses to apply CVD and AD remedies while China is still designated as an NME country.

B.      **Titan failed to exhaust its administrative remedies with respect to the managed exchange rate subsidy.**

Titan argues that Commerce unlawfully refused to investigate the allegation from its petition that the Government of China's managed exchange rate subsidy program constituted a countervailable subsidy. (Titan CVD Br. 9–19; see also Titan App. Tab CVD PR Doc. 1., at

47–57.)  Commerce's <u>CVD Notice</u> determined that, pursuant to 19 U.S.C. § 1671a(b)(1), Titan had not alleged the necessary elements for imposition of a countervailing duty, and, therefore, it did not include the subsidy in its CVD investigation.  <u>See</u> <u>CVD Notice</u>, 72 Fed. Reg. at 44,124. Titan did not object to this determination in its case brief below.  (<u>See</u> App. in Supp. of Def.'s Resp. to Mots. for J. Upon the Agency Rs. Tab 51.)

"[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  <u>Sandvik Steel Co. v. United States</u>, 164 F.3d 596, 599 (Fed. Cir. 1998) (internal quotation marks and citation omitted).  Commerce's regulations provide that a party's case brief "must present all arguments that continue in the submitter's view to be relevant to [Commerce's] final determination."  19 C.F.R. § 351.309(c)(2).  This is so that all arguments "may be appropriately addressed by [Commerce]" before any judicial review occurs.  <u>Nakornthai Strip Mill Pub. Co. v. United States</u>, 558 F. Supp. 2d 1319, 1329 (CIT 2008) (internal quotation marks and citations omitted).  Further, the exhaustion of administrative remedies is required "where appropriate."  28 U.S.C. § 2637(d). Although Titan made the allegation in its petition, failure to raise an argument in a case brief can be a failure to exhaust administrative remedies.  <u>See</u> <u>Carpenter Tech. Corp. v. United States</u>, 464 F. Supp. 2d 1347, 1349–50 (CIT 2006).  Titan knew of the disposition of its claim and stood mute.

While the court does not here rule on the merits of the parties' other subsidy specific arguments, the court does find that because Titan did not object to the exclusion of the

managed exchange rate subsidy in its case brief below, Titan has failed to exhaust its

administrative remedies with regard to its managed exchange rate subsidy allegation.[17]

Accordingly, the court declines to allow Titan to raise this argument now.

## CONCLUSION

For all the foregoing reasons, the court remands the matter for Commerce to

forego the imposition of CVDs on the merchandise at issue or for Commerce to adopt additional

policies and procedures to adapt its NME AD and CVD methodologies to account for the

imposition of CVD remedies on merchandise from the PRC.  Additionally, if it imposes CVD

remedies, Commerce must refrain from using a uniform cut-off date for identifying and

measuring subsidies in the PRC while it remains a designated NME and must evaluate the

specific facts of each subsidy to determine what kind of subsidy exists and whether it is

measurable at a particular time in the PRC.

Commerce shall file its remand determination with the court within ninety days of

---

[17]    Additionally, none of the exceptions to the exhaustion doctrine apply.  These limited exceptions include: (1) the issue is a pure question of law that would not require further agency involvement; (2) the petitioner did not have access to confidential information; (3) an intervening judicial decision excuses the failure to raise the issue below; and (4) futility.  See, e.g., Budd Co. v. United States, 773 F. Supp. 1549, 1555 n.2 (CIT 1991).  Titan contends that the futility exception applies because no adequate relief could have been granted at the administrative level.  (Br. of Titan in Reply to the Opp'n of the United States & GPX & Starbright to Titan's Mot. for J. on the Agency R. (CVD) 1–4.)  The futility exception, however, is narrow and only applies in situations where parties "would be required to go through obviously useless motions in order to preserve their rights."  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (internal quotation marks and citation omitted).  Here, nothing in the record suggests that comments submitted in a case brief would constitute an obviously useless endeavor.  By raising the argument Titan would have given Commerce the opportunity to address its concerns.

this date.  GPX, TUTRIC, Bridgestone, and Titan have eleven days thereafter to file objections,

and Commerce will have seven days thereafter to file its response.


                                                        /s/ Jane A. Restani
                                                          Jane A. Restani
                                                          Chief Judge



Dated: This 18th day of September, 2009.
           New York, New York.

**ERRATA**

Please make the following change to <u>GPX International Tire Corporation, et al. v. United States,</u> Consol. Court No. 08-00285, Slip Op. 09-103:

Page 1, counsel list: strike the following:

- "<u>Winston & Strawn LLP</u> (<u>Daniel L. Porter</u> and <u>James P. Durling</u>); <u>Hinckley, Allen & Snyder LLP</u> (<u>Eric F. Eisenberg</u>); <u>Orrick, Herrington & Sutcliffe LLP</u> (<u>John A. Jurata, Jr.</u>) for the plaintiffs.

And replace with:

- "<u>Winston & Strawn LLP</u> (<u>Daniel L. Porter</u>, <u>James P. Durling</u>, <u>Matthew P. McCullough</u>, <u>Ross E. Bidlingmaier</u>, and <u>Valerie S. Ellis</u>) for the plaintiffs.

September 29, 2009