# United States Court of Appeals for the Federal Circuit

---

**GPX INTERNATIONAL TIRE CORPORATION AND HEBEI STARBRIGHT TIRE CO., LTD.,**
*Plaintiffs-Appellees,*

**and**

**TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.,**
*Plaintiff-Appellee,*

**v.**

**UNITED STATES,**
*Defendant-Appellant,*

**and**

**TITAN TIRE CORPORATION AND UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INTERNATIONAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,**
*Defendants-Appellants,*

**and**

**BRIDGESTONE AMERICAS, INC. AND BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC,**
*Defendants-Appellants.*

---

2011-1107, -1108, -1109

---

Appeals from the United States Court of International Trade in consolidated case no. 08-CV-0285, Judge Jane A. Restani.

———————————

Decided: December 19, 2011

———————————

JAMES P. DURLING, Winston & Strawn, LLP, of Washington, DC, argued for all plaintiffs-appellees. With him on the brief for GPX International Tire Corporation, et al. were WILLIAM H. BARRINGER, DANIEL L. PORTER, GENE C. SCHAERR and MATTHEW P. MCCULLOUGH.

FRANKLIN E. WHITE, JR., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant United States. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and MICHAEL D. PANZERA, Attorney. Of counsel on the brief was JOHN D. MCINERNEY, Chief Counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

TERENCE P. STEWART, Stewart and Stewart, of Washington, DC, argued for defendants-appellants Titan Tire Corporation, et al. With him on the brief were WESLEY K. CAINE and ELIZABETH J. DRAKE.

FRANCIS J. SAILER, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of Washington, DC, for plaintiff-appellee Tianjin United Tire & Rubber International Co., LTD. With him on the brief was ANDREW T. SCHUTZ. Of counsel was MARK E. PARDO.

JOSEPH W. DORN, King & Spalding LLP, of Washington, DC, for defendants-appellants Bridgestone Americas, Inc., et al. With him on the brief were JEFFREY M. TELEP and P. LEE SMITH, JR. Of counsel were CHRISTOPHER T. CLOUTIER, ASHLEY C. PARRISH and J. MICHAEL TAYLOR.

ROGER B. SCHAGRIN, Schagrin Associates, of Washington, DC, for amicus curiae Committee on Pipe and Tube Imports. With him on the brief was JOHN W. BOHN.

JEFFREY D. GERRISH, Skadden, Arps, Slate, Meagher & Flom, LLP, for amicus curiae United States Steel Corporation. With him on the brief were ROBERT E. LIGHTHIZER, JAMES C. HECHT and STEPHEN J. NARKIN.

KATHLEEN W. CANNON, Kelley Drye & Warren LLP, of Washington, DC, for amici curiae ArcelorMittal USA LLC, et al. With her on the brief were PAUL C. ROSENTHAL and GRACE W. KIM.

ALAN H. PRICE, Wiley Rein LLP, of Washington, DC, for amici curiae The Committee to Support U.S. Trade Laws, et al. With him on the brief were TIMOTHY C. BRIGHTBILL and ROBERT E. DEFRANCESCO.

DONALD B. CAMERON, Troutman Sanders LLP, of Washington, DC, for amicus curiae Ministry of Commerce, People's Republic of China. With him on the brief were JULIE C. MENDOZA, R. WILL PLANERT, BRADY W. MILLS and MARY S. HODGINS.

———————————

Before RADER, *Chief Judge*, LINN and DYK, *Circuit Judges*.

DYK, *Circuit Judge.*

In this consolidated countervailing duty case, the U.S. Court of International Trade ("Trade Court") ordered the U.S. Department of Commerce ("Commerce") not to impose countervailing duties on goods from China, a non-market economy ("NME") country. *See GPX Int'l Tire Corp. v. United States* ("*GPX III*"), No. 08-00285, 2010 WL 3835022 (Ct. Int'l Trade Oct. 1, 2010). The Trade Court held that Commerce's 2007 interpretation of countervailing duty law as permitting the imposition of such duties was "unreasonable" because of the high likelihood of "double counting" when both countervailing duties and antidumping duties are assessed against goods from NME countries. *GPX Int'l Tire Corp. v. United States* ("*GPX I*"), 645 F. Supp. 2d 1231, 1240 (Ct. Int'l Trade 2009). We affirm, but on a different ground: we find that when amending and reenacting countervailing duty law in 1988 and 1994, Congress legislatively ratified earlier consistent administrative and judicial interpretations that government payments cannot be characterized as "subsidies" in a non-market economy context, and thus that countervailing duty law does not apply to NME countries.

BACKGROUND

I

The Tariff Act of 1930, as amended, provides for two types of duties on imports that injure domestic industries: First, Congress has imposed antidumping duties on goods "sold in the United States at less than . . . fair value." 19 U.S.C. § 1673 (2006). Second, countervailing duties are imposed on goods that receive "a countervailable subsidy" from a foreign government. *Id.* § 1671(a). Antidumping duties are thus directed to the exporter, while countervailing duties remedy government conduct. This case involves an alleged "domestic subsidy," where the subsidy

benefits both domestic and exported goods, as opposed to an "export subsidy," which benefits only exports. *See id.* § 1677(5A). In the case of goods exported from market economy countries (non-NME countries), both antidumping and countervailing duties may be imposed. The question here is whether both duties may be imposed on goods from NME countries.

While the countervailing duty law makes no references to NMEs, the antidumping law deals directly with the problem of exports from NME countries. For goods exported by a typical market economy country, the antidumping duty equals the goods' price in the United States (the "export price" or "constructed export price") minus their price in the exporting country (the "normal value"). *See id.* §§ 1673, 1677a-1677b. In a "nonmarket economy country," however, local prices cannot be used to calculate the normal value because, by definition, "sales of merchandise in such country do not reflect the fair value of the merchandise." *Id.* § 1677(18)(A). Instead, Commerce may estimate the normal value based on data from "appropriate" market economy countries.[1] *Id.* § 1677b(c).

Because normal values calculated from surrogate countries do not reflect domestic subsidies, the result potentially is that the normal value calculation may be higher than the actual sale price in the NME country. On the other side of the equation, export price is generally unaffected by the fact that an NME country is involved. While the statute provides that countervailing duties imposed on exported goods shall be added to the export price, domestic subsidies do not affect the calculation of

---

[1] This approach was first used in the Trade Act of 1974, Pub. L. No. 93-618, § 321(d), 88 Stat. 1978, 2046-47 (1975), which allowed Commerce to use the price of similar goods in a "non-state-controlled-economy country."

export price.[2]  The overall result is arguably the imposition of a higher dumping margin for NME countries as the result of failure to take account of domestic subsidies. It is urged that if countervailing duties are also imposed for NME countries, the subsidy would be double counted.

## II

As discussed in greater detail below, Commerce apparently first considered whether to impose countervailing duties on goods from NME countries in 1983. In 1983, Georgetown Steel Corp. and other American manufacturers petitioned Commerce to impose countervailing duties on imports from an NME (Czechoslovakia), and in 1984, Commerce determined that countervailing duty law did not apply to NMEs. Carbon Steel Wire Rod from Czechoslovakia: Final Negative Countervailing Duty Determination ("Wire Rod"), 49 Fed. Reg. 19,370, 19,370-19,371, 19,374 (May 7, 1984).  The American manufacturers appealed and succeeded in the Trade Court. *Cont'l Steel Corp. v. United States*, 614 F. Supp. 548 (Ct. Int'l Tr. 1985).  Commerce appealed to our court, arguing that a subsidy is "a device used by governments to distort the signals that the market gives to firms," and that by definition, subsidies do not exist in NMEs. Brief for Appellant at 25, *Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986) (No. 85-2805) ("*Georgetown Steel* Brief"). This court ultimately reinstated Com-

---

[2]  If Commerce imposes both countervailing duties to remedy an export subsidy and antidumping duties, the export price used to calculate the antidumping duty must be "increased [and the dumping margin decreased] by . . . the amount of any countervailing duty imposed . . . to offset an export subsidy." *Id.* § 1677a(c)(1).  This adjustment is not made for countervailing duties based on domestic subsidies presumably because these subsidies are already reflected in the normal value.

merce's decision in *Georgetown Steel Corp. v. United States*, 801 F.2d at 1309.

Commerce continued to maintain that countervailing duty law did not apply in a non-market context until 2007, when it issued a memorandum stating that it could apply countervailing duties to merchandise from China, an NME country.[3] *See* Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China – Whether the Analytical Elements of the *Georgetown Steel* Opinion Are Applicable to China's Present-Day Economy (Mar. 29, 2007), *available at* http://ia.ita.doc.gov /download/nme-sep-rates/prc-cfsp/china-cfs-georgetown-applicability.pdf ("*Georgetown Steel* Memo"). The *Georgetown Steel* Memo did not address the statutory text or legislative history of countervailing duty law; rather, it examined the details of China's economy and determined that while China "remains an NME for purposes of the U.S. antidumping law," it was "significantly different from the Soviet-style economies at issue in *Georgetown Steel*," and that these differences enabled Commerce to

---

[3] In 1992, Commerce developed "criteria for determining whether a market-oriented industry exists in an economy which will otherwise be considered nonmarket," in which case market-based antidumping and countervailing duty law could both apply within an NME. Preliminary Determination of Sales at Less Than Fair Value: Sulfanilic Acid from the People's Republic of China, 57 Fed. Reg. 9409, 9411 (Mar. 18, 1992). However, Commerce has never found an industry to be "market-oriented," and has thus never applied this exception. *See, e.g.*, Final Negative Countervailing Duty Determinations: Oscillating and Ceiling Fans from the People's Republic of China, 57 Fed. Reg. 24,018, 24,019 (June 5, 1992) ("[W]e have determined that the PRC fans industry is not an MOI [market-oriented industry]. As a result, we determine that the [countervailing duty] law cannot be applied . . . .").

calculate whether the government subsidized specific goods. *Id.* at 2, 4, 10.

After Commerce issued the *Georgetown Steel* Memo, in June 2007 U.S. tire manufacturer Titan Tire Co. petitioned that Commerce impose both antidumping duties and countervailing duties on certain Chinese tires, including those manufactured by Hebei Starbright Tire Co. (owned by GPX International Tire Corp.) and Tianjin United Tire & Rubber International Co. ("TUTRIC"). *See GPX I*, 645 F. Supp. 2d at 1235-36. In 2008, Commerce issued both its order imposing countervailing duties, *see* Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Countervailing Duty Order, 73 Fed. Reg. 51,627 (Sept. 4, 2008), and its order imposing antidumping duties, *see* Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 73 Fed. Reg. 51,624 (Sept. 4, 2008). Seven complaints were filed to contest Commerce's antidumping and countervailing duty determinations, which were consolidated by the Trade Court. *See GPX I*, 645 F. Supp. 2d at 1236.

In *GPX I*, the Trade Court found that it could not "say from the statutory language alone that Commerce does not have the authority to impose [countervailing duties] on products from an NME-designated country," but that "Commerce's interpretation of the NME [antidumping duty] statute in relation to the [countervailing duty] statute . . . [was] unreasonable." *Id.* at 1239-40. Because "the NME [antidumping] statute was designed to account for government intervention in an NME country's economy, including resulting price distortion," the court found that imposing both antidumping duties and countervailing duties "could very well result in a double remedy." *Id.* at 1239, 1242. This double counting could occur when

Commerce imposed countervailing duties to offset a domestic subsidy but then calculated antidumping duties by comparing the subsidized export price with a subsidy-free normal value based on estimates from surrogate countries. *See id.* at 1241.[4] Commerce disputed that domestic subsidies had a significant effect on export prices, but the Trade Court found it unreasonable for Commerce to put the burden to demonstrate double counting on foreign manufacturers. *See id.* at 1242-43. The court remanded with instructions for Commerce "to forego the imposition of [countervailing duties] on the merchandise at issue or . . . to adopt additional policies and procedures to . . . account for the imposition of [countervailing duty] remedies." *Id.* at 1251.[5]

On remand, Commerce decided to offset the countervailing duties against the antidumping duties on the same merchandise to avoid this double counting problem. *See GPX Int'l Tire Corp. v. United States* ("*GPX II*"), 715 F. Supp. 2d 1337, 1343 (Ct. Int'l Trade 2010). The Trade Court found this approach unreasonable, both because it rendered the countervailing duty investigation "unnecessary because the same remedial price adjustment can

---

[4] In *GPX Int'l Tire Corp. v. United States* ("*GPX II*"), the Trade Court explained that "any resulting NME [antidumping] margin in theory also captures the competitive advantage that subsidies may provide because the constructed [normal value] is subsidy-free, and presumably higher than a subsidized [normal value], while the U.S. price presumably reflects in some way the price-lowering benefits of the subsidies." 715 F. Supp. 2d 1337, 1344 (Ct. Int'l Trade 2010).

[5] In *GPX I*, the Trade Court also held that if Commerce applied countervailing duty law to China, it could not use a bright-line cut-off date. 715 F. Supp. at 1250. In view of our decision that the countervailing duty law does not apply to NME countries, we do not reach this question.

otherwise be obtained by merely conducting an NME [antidumping] investigation" and because the offset is "inconsistent with 19 U.S.C. § 1677a, which lists the specific offsets to export price and constructed export price that are permissible," and which does not list offsets for countervailing duties based on domestic subsidies. *Id.* at 1345. In summary, the court held "that the offset does not comply with the statute and is also unreasonable due to the expense associated with conducting an additional investigation that is essentially useless." *Id.* The court again remanded to Commerce with instructions to not impose countervailing duties. *Id.* at 1354. In response to the court's direction, Commerce declined to impose countervailing duties under protest, and the Trade Court entered judgment sustaining this determination. *GPX III*, 2010 WL 3835022, at *1.

The United States and the U.S. manufacturers favoring the imposition of countervailing duties timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

The interpretation of the countervailing duty statutes is a question of law, which we review de novo. *See Brother Int'l Corp. v. United States*, 464 F.3d 1319, 1324 (Fed. Cir. 2006). However, if after applying the traditional tools of statutory construction, the statute is ambiguous, "statutory interpretations articulated by Commerce during its adjudicatory proceedings are entitled to *Chevron* deference." *Magnolia Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1355 (Fed. Cir. 2007); *see Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379 (Fed. Cir. 2001).

The Trade Court's decision barred the imposition of countervailing duties because of the "substantial potential for double counting" if countervailing duties and antidumping duties were both applied to imports from NMEs. *GPX II*, 715 F. Supp. 2d at 1345 (citing *GPX I*, 645 F. Supp. 2d at 1243). This reasoning is problematic both because the extent to which the statute may prohibit double counting is unclear,[6] and because Commerce has determined that it is far from clear that double counting has in fact occurred. We nonetheless conclude that Commerce is barred by the statute from imposing countervailing duties on NME goods. As explained below, the legislative history of the countervailing duty law, and particularly Congress's repeated reenactment of countervailing duty law while approving the *Georgetown Steel* holding, demonstrates that Congress adopted Commerce's then-prevailing position that countervailing duties cannot be imposed on NME exports.

## II

Commerce's primary argument is that the plain statutory language mandating that a countervailing duty "shall be imposed" requires it to impose countervailing duties when it is able to identify a subsidy, even in an NME country. *See* Commerce Br. 19-23; Commerce Reply Br. 2. We disagree. The text of the relevant statute states that if "the administering authority determines that the government of a country . . . is providing, directly or indirectly, a countervailable subsidy," and if the domestic injury requirement is met, "then there shall be im-

---

[6] *See generally Wheatland Tube Co. v. United States*, 495 F.3d 1355 (Fed. Cir. 2007) (sustaining Commerce's decision to avoid double counting by not deducting "safeguard duties" from the export price used to calculate antidumping duties).

posed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net countervailable subsidy." 19 U.S.C. § 1671. Contrary to Commerce's argument we do not find the statute to be clear on its face. The statute does not explicitly require the imposition of countervailing duties on goods from NME countries. The question is whether government payments in an NME economy constitute "countervailable subsidies" within the meaning of the statute. We have indeed previously held that the statute does not compel the imposition of countervailing duties to goods from NME countries because the government payments with respect to such goods are not "bounties or grants," or "countervailable subsidies" in the current terminology.[7] *Georgetown Steel*, 801 F.2d at 1314.

Section 303 of the Tariff Act of 1930, the predecessor to the current countervailing duty law, stated that "whenever any country . . . shall pay or bestow, directly or indirectly, any bounty or grant," then "there shall be levied . . . in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant." 19 U.S.C. § 1303 (1988) (repealed 1994). In *Georgetown Steel* we found that the "economic incentives and benefits" provided by governments in NME countries "do not constitute bounties or grants under section 303," 801 F.2d at 1314, that is, "countervailable subsidies" in the language of the current statute. *Georgetown Steel* found "no indication . . . that Congress intended" this law to apply to NME exports, noting that the purpose of countervailing duty

---

[7] We also fail to see how section 1677a(c)(1), which requires the export price to be increased by "the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy," suggests that government payments must be treated as countervailable subsidies in NME countries.

law is "to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies," and that "[i]n exports from a nonmarket economy . . . this kind of 'unfair' competition cannot exist." 801 F.2d at 1315-16 (quoting *Zenith Radio Corp. v. United States*, 437 U.S. 443, 456 (1978)). We stated that "[e]ven if one were to label the[] incentives [provided by NMEs to exporting entities] as a 'subsidy,' . . . the governments of those nonmarket economies would in effect be subsidizing themselves." *Id.* at 1316. We thus upheld Commerce's decision not to impose countervailing duties on goods from NME countries.

The "bounty or grant" language of Section 303 involved in *Georgetown Steel* was replaced by the current "countervailable subsidy" language in the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), but Congress made clear that this change was not intended to substantively affect the countervailing duty law.[8] The URAA Statement of Administrative Action ("SAA"), which "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the [URAA]," 19 U.S.C. § 3512(d), stated that "the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions of the statute" and that "practices countervailable under the current law will be

---

[8]    The current countervailing duty statute, 19 U.S.C. § 1671, was first enacted in 1979 but applied only to countries under the Agreement on Subsidies and Countervailing Measures. The 1994 amendments made the provision generally applicable. From the beginning, Congress stated that "'subsidy' has the same meaning as the term 'bounty or grant' as that term is used in section 303 of this Act." Trade Agreements Act of 1979, Pub L. No. 96-39, § 101, 93 Stat. 144, 177.

countervailable under the revised statute," H.R. Doc. No. 103-316, at 925 (1994). Thus, *Georgetown Steel* is equally applicable to the revised statute.[9]

We would normally be obligated to follow *Georgetown Steel* in interpreting the revised statute. However, the government argues that *Georgetown Steel* did not independently interpret the statute, but rather afforded *Chevron* deference to Commerce's interpretation of what the court found to be an ambiguous statute. It urges that once Commerce changes its interpretation, the court is required to defer to the new interpretation. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."). While *Georgetown Steel* could perhaps be interpreted as resting on *Chevron*, the problem is that, even if Commerce were correct about *Georgetown Steel*, Congress thereafter ratified the prevailing interpretation by amending and reenacting the countervailing duty statute in 1988 and 1994, thereby requiring that we construe the statute as barring countervailing duties in the NME context.

### III

The principle of legislative ratification is well established. In the case of a widely known judicial decision or

---

[9] While the SAA included the qualifier "unless that practice or interpretation is inconsistent with the definition contained in the bill," *id.*, the new statute's elaborate definition of "countervailable subsidy," 19 U.S.C. § 1677(5), did not extend the definition to government payments in non-market economy countries.

agency practice, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see, e.g.*, *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2491-92 (2009); *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998). Even where the legislative history does not explicitly reference a prior interpretation, the Supreme Court has often found that Congress has ratified lower court and agency interpretations through statutory reenactment. *See, e.g.*, *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S. Ct. 1605, 1616 (2010); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 384-86 (1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379-382 (1982).

There is a stronger presumption of ratification where "the legislative history . . . demonstrates that Congress was indeed well aware of [the prior interpretation]." *Lindahl v. OPM*, 470 U.S. 768, 782 (1984). The issue in *Lindahl* was whether a statute barred judicial review of certain Merit Systems Protection Board judgments, and the Supreme Court noted that the legislative history of a 1980 amendment to the statute specifically referred to the so-called *Scroggins* standard, which allowed a limited review. *Id.* at 771, 782-83 (citing *Scroggins v. United States*, 397 F.2d 295 (Ct. Cl. 1968)). The Court stated that "[i]f Congress had intended by the 1980 amendment . . . to abolish the [*Scroggins*] standard . . . there would presumably be some indication in the legislative history to this effect." *Id.* at 787. Similarly, in *Disabled American Veterans v. Secretary of Veterans Affairs*, 419 F.3d 1317, 1322-23 (Fed. Cir. 2005), we held that a Senate Report's reference to a Board of Veterans' Appeals prac-

tice during enactment of the relevant statute indicated an "implied adoption" of the agency practice.

Once Congress has ratified a statutory interpretation through reenactment, agencies no longer have discretion to change this interpretation. For example, in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126-27 (2000), the FDA went through notice-and-comment rule-making to conclude that it had jurisdiction to regulate cigarettes under the Food, Drug, and Cosmetic Act ("FDCA"), contrary to its longstanding position. The Supreme Court held that Congress had ratified the FDA's prior position that it lacked jurisdiction, and thus that the FDA could not change its interpretation. The Court noted that, in adopting legislation addressing tobacco use over the previous decades,

> Congress has acted against the backdrop of the FDA's consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco . . . . In fact, . . . Congress considered and rejected bills that would have granted the FDA such jurisdiction. Under these circumstances, it is evident that Congress' tobacco-specific statutes have effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products.

*Id.* at 144. In finding legislative ratification, the Court emphasized Congress's specific awareness of the FDA's position, as evidenced by the FDA testifying to its lack of jurisdiction during congressional hearings, and Congress's rejection of proposals that would have given it this authority. *Id.* at 145-55. Similarly, in *Commissioner v. Engle*, 464 U.S. 206, 224-25 (1984), the Court did not permit the Commissioner to choose "among reasonable interpretations" of the Internal Revenue Code because in

that case, Congress had adopted prior judicial interpretations when reenacting the Code.

In the present context, even before the 1988 legislation, there was a significant argument for legislative ratification. As discussed above, Commerce first considered imposing countervailing duties on NME imports in 1983, when a countervailing duty subsidy was called a "bounty or grant," 19 U.S.C. § 1303 (1988) (repealed 1994). In 1984, Commerce determined that "a 'bounty or grant,' within the meaning of the countervailing duty law, cannot be found in an NME" because "the notion of a subsidy is, by definition, a market phenomenon." *Wire Rod*, 49 Fed. Reg. at 19,372, 19,374.

Commerce described this decision to Congress in a 1984 hearing on trade remedies, noting that "[i]n final decisions in Czech and Polish wire rod cases last week, we concluded that bounties or grants within the meaning of the countervailing duty law cannot be applied to NME's." *Nonmarket Economy Imports Legislation: Hearing Before the Subcomm. on Int'l Trade of the Comm. on Fin.*, 98th Cong. 5 (May 7, 1984) (statement of Lionel H. Olmer, Undersecretary for Int'l Trade, Dep't of Commerce). Congress enacted other changes to the trade laws in the Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948, but rejected provisions that would have affected trade remedies on NME imports, 130 Cong. Rec. 30,453 (1984).[10] In explaining the "[p]resent law" on NME imports, the conference noted that "the Department of Commerce has determined that the countervailing duty

---

[10] The 1984 Hearing was on S. 1351, 98th Cong., 129 Cong. Rec. 13,492 (1983), which was incorporated into the Senate's version of the Trade and Tariff Act of 1984 but was eliminated by the conference committee. The proposal would have created an alternative trade remedy for imports from NME countries.

laws cannot be applied to nonmarket economy imports" and that "[t]his decision is pending judicial resolution," referring to the then-pending *Georgetown Steel* case. *Id.* Congress was thus well aware of Commerce's interpretation that countervailing duties could not be imposed on NME imports, and when reenacting the trade law, it rejected amendments designed to alter that approach.

Commerce itself argued in its *Georgetown Steel* brief that the 1984 legislative history demonstrated "congressional ratification of and acquiescence in [Commerce]'s interpretation." *Georgetown Steel* Brief at 50. Describing the congressional events of 1984, Commerce urged that it was "clear that Congress considered [Commerce]'s construction of the [countervailing duty] law, but took no steps to revise or repeal it," and argued that this "congressional acquiescence is persuasive evidence that the construction is the one intended by Congress." Id. at 51. While our decision in *Georgetown Steel* did not explicitly adopt Commerce's ratification argument, we relied on the fact that "recent actions of Congress in dealing with the problem of exports by nonmarket economies" showed "no indication in any of those statutes, or their legislative history, that Congress intended or understood that the countervailing duty law would apply." 801 F.2d at 1316.

Whether or not Congress's actions in 1984 amounted to legislative ratification, as Commerce argued in *Georgetown Steel*, its actions in 1988 and 1994 clearly did. In 1988, Congress passed the Omnibus Trade and Competitiveness Act of 1988, H.R. 3, 100th Cong. Although this act was vetoed, the legislative history is relevant because it was explicitly incorporated into the revised trade bill that was then enacted, as discussed below. Section 157 of the H.R. 3 House bill had attempted to supersede *Georgetown Steel* by adopting a provision that the countervailing duty laws "apply with respect to any non-market economy

country . . . to the extent that the administering authority can reasonably identify, and determine the amount of, a subsidy provided by that country." H.R. 3, 100th Cong., § 157, 133 Cong. Rec. 10,722 (1987) (as passed by House). This provision was proposed in direct response to *Georgetown Steel*, as indicated by the House Committee Report:

> In a recent court case . . . the Federal Circuit upheld the Department of Commerce's refusal to apply the countervailing duty law in two investigations of carbon steel wire rod imports from Poland and Czechoslovakia, by holding that the countervailing duty law does not apply to non-market economy countries. *Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986).
>
> Section 157 of H.R. 3 . . . provide[s] for the application of the countervailing duty law to non-market economy countries *to the extent that* a subsidy can reasonably be identified and measured . . . .
>
> The Committee is aware of . . . [the] difficulties of applying the countervailing duty law, which is generally based on market-oriented principles, to countries whose economies are generally not market-oriented. Nevertheless, it is not the intent of the Committee to allow for non-market economy countries to be completely exempt from the countervailing duty law under all circumstances.

H.R. Rep. No. 100-40, at 138 (1987). This provision would have given Commerce the very authority it now claims: the ability to impose countervailing duties on NME imports where the existence and amount of a subsidy can be reasonably identified. But section 157 was rejected by the

conference committee. *See* H.R. Rep. No. 100-576, at 628 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1661. Instead, the conference chose to retain the "[p]resent law," which was described simply as the holding of *Georgetown Steel*: "In 1986, the U.S. Court of Appeals for the Federal Circuit held that the countervailing duty law does not apply to nonmarket economy countries." *Id.* (citing *Georgetown Steel,* 801 F.2d at 1308).

Although President Reagan vetoed H.R. 3 without reference to the countervailing duty provisions, *see* Message from the President of the United States Transmitting His Veto of H.R. 3, H.R. Doc. 100-200 (1988),[11] Congress then passed a revised trade bill, H.R. 4848, 100th Cong. (1988), which the President signed into law as the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107. The act specifically stated that "the legislative history . . . of the conference report to accompany H.R. 3 . . . shall be treated . . . as being the legislative history of the [analogous] provision of this Act," *id.* § 2, indicating that Congress viewed H.R. 4848 as a continuation of H.R. 3. Part 2 of the act, titled "Improvement in the Enforcement of the Antidumping and Countervailing Duty Laws," made a number of changes to countervailing duty law, but did not resurrect section 157 of H.R. 3. *See id.* §§ 1311-1337.

This legislative history indicates that Congress was well aware of *Georgetown Steel* and that it rejected a statutory provision to supersede it—a provision that made the same distinction Commerce now proposes. Congress's description of *Georgetown Steel* was more than a "passing

---

[11]    President Reagan's primary objection was that the bill's "mandatory requirement for businesses to give advance notice of closings and layoffs," which "arbitrarily mandate[d] . . . exactly when and in what form that notification should take place." *Id.* at 1.

reference" that was inserted into the *Congressional Record* by a single senator, *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 132 n.8 (1988), and the rejected section 157 was proposed in direct response to the *Georgetown Steel* decision.[12]  Section 157 was rejected in the course of enacting alternative legislation, and the conference committee specifically described *Georgetown Steel* as the "[p]resent law."  "Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation." *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987).  Just as the rejected proposals in *Hamdan* were persuasive evidence that Congress did not wish to confer the claimed authority, the legislative history of the 1988 trade laws is persuasive evidence that Congress did not wish to alter existing law to apply countervailing duties to imports from NMEs. *See also FDA v. Brown & Williamson Tobacco*, 529 U.S. at 144, 147-48 (relying on the enactment of legislation against the backdrop of rejected proposals to confer jurisdiction on the FDA).

After the 1988 legislative ratification, Commerce continued to maintain a consistent position that countervailing duty laws are not applicable to NMEs. *See, e.g.*, Study of the Application of U.S. Trade Laws to Countries Developing Market-Oriented Economies, 54 Fed. Reg. 12,941

---

[12]  As discussed above, the House Committee Report specifically described *Georgetown Steel* as "holding that the countervailing duty law does not apply to non-market economy countries" and said that section 157 would instead apply the countervailing duty laws to NME countries when possible.  H.R. Rep. No. 100-40, at 138 (1987). *Cf. Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 171 (2001) ("[R]espondents point us to no persuasive evidence that . . . [the] failure [of the bill] indicated congressional acquiescence to such jurisdiction.").

(Mar. 29, 1989); Rescission of Initiation of Countervailing Duty Investigation and Dismissal of Petition: Chrome-Plated Lug Nuts and Wheel Locks from the People's Republic of China, 57 Fed. Reg. 10,459, 10,460 (Mar. 26, 1992) ("[W]e determine that the PRC producers of lug nuts are nonmarket economy producers to which the countervailing duty law cannot be applied. *See George-town Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986)."); Final Affirmative Countervailing Duty Determination: Certain Steel Products from Austria, 58 Fed. Reg. 37,217, 37,261 (July 9, 1993) ("In *Georgetown Steel*, the court simply concluded as a matter of law that the CVD statute is not applicable to nonmarket economies because the concept that the receipt of a subsidy constitutes a distortion in the normal allocation of resources has no meaning in such an economy. . . . [I]n a nonmarket economy, it is impossible to say that a producer has received a subsidy . . . ."); Final Affirmative Countervailing Duty Determinations: Certain Steel Products from Germany, 58 Fed. Reg. 37,315, 37,324 (July 9, 1993) ("[T]he countervailing duty laws are not applicable to NME's . . . .").

Against this backdrop, Congress again ratified our *Georgetown Steel* decision and Commerce's existing practice in 1994, when it again overhauled U.S. trade law by passing the URAA. There Congress reenacted most of the countervailing duty law while making changes to conform the trade laws to international agreements. None of these changes substantively affected countervailing duty law as it pertains to this case. As discussed above, the URAA stated that countervailing duties are imposed to remedy a "countervailable subsidy" rather than a "bounty or grant," URAA §§ 261-262, but the SAA made clear that "the definition of 'subsidy' will have the same meaning that administrative practice and courts have ascribed to the term 'bounty or grant' and 'subsidy' under prior versions

of the statute," H.R. Doc. No. 103-316, at 925 (1994). In clarifying that Commerce need not determine that subsidies affect price or output in order to impose countervailing duties, the SAA noted that "the holding in *Georgetown Steel* . . . was limited to the reasonable proposition that the [countervailing duty] law cannot be applied to imports from nonmarket economy countries." *Id.* at 926.

Commerce does not argue that Congress was unaware of *Georgetown Steel* or Commerce's practice in 1988 and 1994, or that Congress did not approve that practice. Indeed, as discussed above, Congress specifically rejected proposals that would have given Commerce the authority it now claims. Rather, Commerce now argues that (1) the past practice, which we have found to have been legislatively ratified, did not extend to all NMEs; (2) Congress in 2000 made clear that countervailing duty law should be applied to China; and (3) unenacted legislation in 2010 supports Commerce's position. None of these three arguments is persuasive.

Commerce contends that *Georgetown Steel* "does not support th[e] proposition" that "[countervailing duties] could not be applied to exports also subject to NME [antidumping duties]," Commerce Br. 32, because *Georgetown Steel* only applies when "it is impossible to identify subsidies within" the NME, Commerce Reply Br. 7. However, *Georgetown Steel* itself makes no such a distinction, and Commerce never suggested that the trade laws contain such a distinction before issuing the *Georgetown Steel* Memo in 2007. In any event, "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was." *Lindahl*, 470 U.S. at 790 (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 828 (1976)). The legislative history from both 1988 and 1994 demonstrates that Congress believed the countervailing duty law could not

be applied to NMEs under *Georgetown Steel*, and made no distinction among NME countries. Moreover, the 1988 legislative history shows that Congress rejected a proposal that would have made the very distinction among NME countries that Commerce urges now.

Nor does the 2000 legislation demonstrate that Congress sought to undo its earlier ratification. In 2000, Congress enacted legislation providing an appropriation for "defending United States antidumping and countervailing duty measures with respect to products of the People's Republic of China," Pub. L. No. 106-286, § 413(a)(1), 114 Stat. 880, 901 (codified at 22 U.S.C. § 6943(a)(1)). Commerce urges that this indicates that Congress intended countervailing duty law be applied to China as an NME. We do not agree. As of the date of the 2000 legislation, Commerce still maintained that countervailing duty law did not apply to NME countries. Moreover, while a few floor statements mentioned possible application of the countervailing duty law to China, *see, e.g.*, 146 Cong. Rec. 17,509 (statement of Sen. Robert Byrd), nothing in the 2000 legislative history suggests an intent to override the longstanding practice of not applying countervailing duty law to NMEs. Rather, Congress intended Commerce to apply the countervailing duty law to China only if Commerce found either that China was no longer an NME country or that China had a market-oriented industry.[13] Thus, the U.S. Trade Representative—who works jointly with Commerce to enforce the

---

[13] As noted above, Commerce has stated that if it finds an industry within an NME country to be market-oriented, then market-oriented antidumping law and countervailing duty law apply. However, Commerce has yet to make a finding of a market-oriented industry. *See supra* note 3. Commerce has also not concluded that China is a market economy. *See Georgetown Steel* Memo 3.

antidumping and countervailing duty laws—specifically stated this understanding at the time: "When we determine that an industry is market oriented or that China is no longer a non-market economy, U.S. countervailing duty law will apply." 146 Cong. Rec. 18,112 (2000). Notably, Commerce thereafter refused to apply countervailing duty law to Hungary when it was still an NME (and immediately before it was designated as a market economy), making no distinction between NME countries and noting that under *Georgetown Steel*, "the countervailing duty . . . provisions of the [Tariff] Act [of 1930, as amended by the URAA] do not apply to NME countries." Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Sulfanilic Acid from Hungary 14 (Sept. 18, 2002), *available at* http://ia.ita.doc.gov/frn/summary/hungary/02-24358-1.pdf (explaining the decision in 67 Fed. Reg. 60,223 (Sept. 25, 2002)).

Finally, Commerce relies on the unenacted Currency Reform for Fair Trade Act, H.R. 2378, 111th Cong. (2010). *See* Commerce Br. 37; Commerce Reply Br. 17. The House committee report noted that "in two pending countervailing duty investigations . . . the Department of Commerce decided not to investigate allegations that the undervaluation of [Chinese] currency . . . confers a countervailable subsidy," and stated that "[t]his legislation clarifies that maintenance . . . of a fundamentally undervalued currency can . . . constitute a countervailable export subsidy." H.R. Rep. No. 111-646, at 7 (2010). But this bill was never voted on by the Senate, and it is well established that statements made in connection with unenacted legislation generally shed little light on the proper interpretation of a prior statute. *See, e.g., Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) ("Failed legislative propos-

als are a particularly dangerous ground on which to rest an interpretation of a prior statute." (internal quotation marks omitted)). If anything, the rejection of this proposal weighs against Commerce's argument that Congress intended countervailing duty law to apply to China.

We thus find that in amending and reenacting the trade laws in 1988 and 1994, Congress adopted the position that countervailing duty law does not apply to NME countries. Although Commerce has wide discretion in administering countervailing duty and antidumping law, it cannot exercise this discretion contrary to congressional intent. We affirm the holding of the Trade Court that countervailing duties cannot be applied to goods from NME countries. As we concluded in *Georgetown Steel*, if Commerce believes that the law should be changed, the appropriate approach is to seek legislative change. *See Georgetown Steel*, 801 F.2d at 1318 ("If [the existing] remedy is inadequate to protect American industry from such foreign competition—a question we could not possibly answer—it is up to Congress to provide any additional remedies it deems appropriate.").

## AFFIRMED

### COSTS

No costs.